(28 Misc. Rep. 291.)

MOSS v. GEDDES et al.

(Supreme Court, Special Term, New York County. July. 1899.)

1. RAILROADS—RIGHTS OF BONDHOLDERS—COMBINATION TO PURCHASE AT FORE-CLOSURE SALE.

Bondholders of a railroad company do not occupy a fiduciary relation to each other as a result of their common interest in the mortgaged property, and, in case of the insolvency of the company, any number of such bondholders may legitimately combine together for their mutual protection, and may purchase the property at a sale under the mortgage in their own interest, without becoming liable to account therefor to other bondholders, where they are guilty of no fraud or unfair dealing.

2. EQUITY—LACHES.

A delay of four years by a bondholder of a railroad company, after the property had been sold and purchased on behalf of other bondholders, with knowledge of such fact, constitutes laches which will bar a suit against the purchasers to assert a right to an interest in the purchase.

Action by Joseph L. Moss, Jr., against Peter Geddes and others. On demurrer to complaint. Sustained.

W. W. West, for plaintiff.
Miller, Peckham & Dixon, for defendants.

STOVER, J. The plaintiff sues in behalf of himself and all others as creditors and holders of the bonds and coupons of the South Carolina Railway, secured by a deed of trust. Generally, the allegations are that the plaintiff is a banker and broker doing business in the city of New York; that on the 1st day of November, 1881, the South Carolina Railway, being a corporation organized under the laws of South Carolina, purchased from certain persons, trustees (not parties to this action), a railway in the state of South Carolina, being all the railway at that time known and operated as the South Carolina Railway, and its branches, its certain franchises, privileges, etc., and, for the payment of the purchase price thereof, authorized the borrowing of $5,000,000, and the issuing and disposing

of bonds bearing date November 1, 1881, and due and payable October 1, 1920, and, at the same time, that said trustees executed and delivered to Samuel Sloan and John S. Barnes, as trustees, a deed in trust, and that said Sloan and Barnes accepted the trust, and entered upon the discharge of their duties; that the plaintiff became the holder of a bond secured by said mortgage on or about the 26th day of October, 1882, and still is the owner and holder of said bond; that on the 1st of October, 1889, the railway made default in the payment of the interest upon the said bonds, and the said trustees, under the provisions of the mortgage, elected that the principal of all of said bonds should become due and payable immediately; that thereafter an action was commenced by one Frederick W. Bound, of the state of New Jersey, in the district court of South Carolina, for the foreclosure of said mortgage, against said South Carolina Railway and against other persons; that said action proceeded to judgment, and that said mortgaged premises were ordered to be sold as an entirety, for cash, at public auction, in the city of Charleston, April 11, 1893, by a special master therein named, in satisfaction of said mortgage; that the judgment of sale provided that said special master should receive no bid at such sale of less than $1,000,000, and, if he deemed it proper, he should receive no bid from any one offering to bid who should not first deposit with him, as a pledge that such bidder would make good his bid in case of its acceptance, the sum of $100,000, in money or certified check, and the further provision that purchasers might turn in to the special master, in lieu of. cash, any bonds or other claims adjudged to be payable out of the proceeds of the mortgaged premises, which should be received and credited as cash on account of the purchase, and, further, that said special master should file a bond in the penal sum of $100,000, with the condition for the faithful performance of the duties therein imposed on him as such special master; that it was provided by the fourth clause of said mortgage that the said trustees might, in their discretion, and should upon the written request of the holders of at least one-half of the amount of the bonds thereby secured, then unpaid and outstanding, cause the said premises so mortgaged to be sold as they should deem necessary and proper, having due regard to the interest of all parties, subject to the lien of said first mortgage, at public auction in the city of Charleston, to the highest bidder, and by another clause it was provided that upon any sale of the said premises, whether by the trustees or under judicial process, the holders of the bonds thereby secured, or any of them, or the said trustees, on behalf of all the bondholders, should have the right to purchase upon equal terms with other persons, and it was made the duty of the said trustees, if so required, in writing, before such sale, by the holders of one-half in amount of the outstanding bonds secured thereby, to make such purchase on behalf of all the bondholders at a reasonable price, etc., and by another clause it was provided that in case of the purchase of the said property, or any part thereof, by the said trustees, the same should be held for the benefit of all bondholders, in proportion to their respective interests in the bonds, and that the property should be conveyed to such persons or corporation as might be designated at a

meeting to be held.　It further alleged that on or about the 30th day of January, 1894, the defendants, in co-operation with those bondholders they represented, who with themselves owned and controlled more than a majority of said bonds, "arbitrarily and wrongfully formed themselves into a self-constituted committee for said bondholders for the purpose and with the intent to control the purchase of said mortgaged property at foreclosure sale, which was soon to take place, for their own purposes, as will more fully hereinafter appear; that, in furtherance of said arbitrary and wrongful co-operation and scheme of the defendants, they caused to be prepared, issued, and circulated a paper writing called 'Bondholders' Agreement, South Carolina Railway 1st Consolidated Mortgage Six Per Cent. Gold Bonds'; that said bondholders' agreement, among other things, gave to said committee full power and authority to do and perform every act and thing requisite to be done in and about the premises, and under and pursuant to the terms of said bonds, and of the mortgage securing said bonds, either by way of request to the trustees to purchase said mortgaged premises at foreclosure sale or otherwise; and, also, said committee was authorized and empowered to purchase said premises, for the benefit of all of said bondholders, at such price (not, however, exceeding the aggregate of the principal and interest at the time being due and unpaid upon) as said committee may consider expedient.　All the bonds secured by said mortgage or deed of trust, and all sums payable out of the purchase money in priority to said bonds as said committee may consider expedient, and for such purpose to incur such expenses as said committee may consider judicious, to use said bonds and coupons held by those who sign said agreement, respectively, for the purpose of paying for the mortgaged premises; or said committee may request the trustees to purchase as in said mortgage provided."　Said complaint also alleged that said committee was authorized to deposit said bonds with the New York Guaranty & Indemnity Company at the time of signing said agreement, subject to the order of said committee, for the purpose of enabling said committee to carry out said agreement, and that, at the time of such deposit, transferable certificates for such bonds and coupons, showing the right and title thereto of the depositor, should be delivered to the depositors, respectively; said certificates to be engraved so as to comply with the New York Stock Exchange rules. Further, that, if the said committee should purchase said mortgaged premises, the same might be conveyed to them, or to such person or persons as said committee might designate, and such purchasers might take possession of the said mortgaged premises for the account and benefit of the holders of said certificate holders, respectively.　Said committee might at any time adopt a plan of reorganization, and thereupon call a general meeting of the said certificate holders for the purpose of action thereon.　"If such or other plan of reorganization be approved at any such meeting by a majority in interest of said certificate holders, or such of them as shall attend such meeting, or be represented at the same by proxy, the plan adopted shall be binding upon all the said certificate holders."　And, also, if, pending the existence of the agreement, an opportunity shall arise to

make a sale of the bonds and coupons so deposited, at not less than the par value of said bonds and coupons and interest on the coupons, said committee was authorized to make such sale, and if an opportunity should arise to make a sale in exchange for new securities to be secured on the mortgaged property, or upon other terms which should commend themselves to the committee, said committee should call a meeting of certificate holders, and should submit to said meeting of certificate holders the proposed terms of sale; said sale to be ratified by two-thirds of the certificate holders present or represented at said meeting. The complaint alleges, also, that said agreement contained a clause that the same should not become effective until signed by a majority of the bondholders, and no bondholder who should not have signed said agreement should have any rights under it, and, further, that the time within which holders of the bonds might sign said agreement should be limited by the decision of the committee, but said committee might extend the time as they might determine. The complaint further alleges that by means of said committee's wealth, and large holdings of said bonds for themselves and those they represented, and the influences and power that their wealth and large holdings and control of said bonds gave them, they induced nearly all of said bondholders, except about $200,000, par value, in amount, to sign said stockholders' agreement, and deposit their bonds with the said New York Guaranty & Indemnity Company, subject to the order of said committee, and that, having obtained control of said bonds, they proceeded to carry out their plan, which the complaint charges to be "arbitrary and wrongful," namely, to control the purchase of said mortgaged property at foreclosure sale at their own price, by using the bonds so deposited as aforesaid to pay for said mortgaged property the same as cash, as they were allowed to do by the decree in foreclosure and by said mortgage, over and above the sum of $1,000,000, and with the intent to prevent competition at said sale, except those who were prepared to pay $6,000,000 cash. The complaint further alleges that the railway was thereafter sold and bid in by said committee at the price of $1,000,000, for themselves and their associates, and that said price was inadequate. Further, that at the time of said sale a plan of reorganization by the junior security holders to said first mortgage was in the hands of a committee composed of wealthy and prominent bankers and other capitalists, and was fostered by the Louisville & Nashville Railroad, who was the owner of about $1,000,000 said second mortgage bonds, which company was desirous of acquiring sufficient interest in the said South Carolina Railway property so as to enable it to make certain traffic arrangements, and that their plan of reorganization contemplated the protection of payment of the first consolidated mortgage bonds; that there was present at said foreclosure sale a representative of the said Louisville & Nashville Railroad, who was prepared with $100,000 cash, to deposit with the master who had charge of said sale, if required, as provided by said decree, and prepared to bid at said sale; that the plaintiff is informed and believes the defendants, by their attorney, publicly announced that any one who should bid for said property must pay therefor $6,000,000, or thereabouts; that said

announcement had the effect of preventing said Louisville & Nashville Railroad from bidding at such sale; that at or about the same time divers persons, in co-operation with said committee, the defendants, associated themselves together and organized a corporation known as the South Carolina & Georgia Railroad, and that the property acquired at the foreclosure sale was sold to said company at a large advance, namely, $5,250,000 first mortgage bonds, and $5,000,000 of the common stock of the new company. Plaintiff further alleges that he had no knowledge of the formation of said committee, or the existence of said bondholders' agreement, until the sale of said mortgaged property at foreclosure; that the committee did not request the trustees of said mortgage to purchase said mortgaged property at foreclosure sale for the benefit of all the bondholders, and that the said South Carolina Railway had and has no other property than the property so mortgaged, and that plaintiff has no other security for his bond; that the plaintiff has been ready and willing to pay his reasonable share of the expenses of the defendants, and at divers times, and shortly before the commencement of this action, viz. on or about October, 1898, demanded that the defendants should account to him for his share of the proceeds, etc. He asks for judgment, and that he have other equitable relief.

A demurrer is interposed to this amended complaint, upon the ground that it does not state facts sufficient to constitute a cause of action. I think the demurrer must be sustained. Any number of bondholders had a right to organize for the purpose of protecting their interests in the property. It does not appear that any effort was made to exclude any bondholder from participation in the agreement that was made by the defendants, but, upon the contrary, this was made upon the basis that all bondholders might obtain its benefits by joining in the agreement. The committee were not bound to solicit the bondholders, nor were they bound to call the attention of every bondholder to the formation of this committee. The mortgage itself contained provisions by which bondholders could protect themselves, and any vigilant bondholder could have endeavored, at least, to get a majority of the bondholders to request the trustees to purchase the property. It does not appear that any attempt was made by any bondholder to do this, but that no attempt was made in any way to look after the interests of the bondholders, except by those participating in the agreement, which is here characterized as "wrongful." And, in passing, there is no allegation of any fact which would show that the defendants were acting fraudulently or wrongfully, and therefore the simple allegation that the act was wrongful must be taken to mean wrongful in law; and therefore, unless the act as alleged is of itself wrongful, the defendants are not to be charged with any fraudulent or wrongful act. A mere characterization of the agreement as "wrongful," without any facts showing that it is such, is not sufficient to charge a wrong in fact. Let us see what the position of the defendants was and is under the agreement. Being bondholders of an insolvent corporation, whose property is about to be sold under mortgage foreclosure, they enter into an agreement with other bondholders by which a committee is intrusted with the manage-

ment and control of the bonds, with power to act within certain limits, and to call meetings of bondholders under certain conditions. Certainly this, of itself, cannot be said to be a wrong, but it is only the act of prudent men who desire to save their property. In pursuance of this agreement, they obtained the consent of a large number of the bondholders, and an agreement is reached by which, under the terms of sale prescribed by the judgment of foreclosure, they are enabled to purchase the property. Up to this time there is no allegation that anybody had attempted or moved to protect the rights of the bondholders, nor is there any claim that anybody was in a position to protect the bondholders. The only allegation that looks in this direction is that a certain committee was "fostered" by the Louisville & Nashville Railroad, which desired to profit by the sale of the road, but followed almost immediately by the allegation that owing to the financial panic, etc., they were not able to pay, or to even, so far as appears in these papers, make a valid bona fide bid. It was said that a representative was present at the sale, and ready to deposit $100,000. If so, all he had to do to protect his clients was to deposit his $100,000 and make his bid. Had there occurred any- thing then which prejudiced the rights of anybody, a court of equity might be called upon. So a portion of the complaint is also given up to allegations of transactions which occurred upon the sale, and which are insufficient to constitute a cause of action here, but, if any merit should attach to them, should be the subject of investiga- tion under the judgment of foreclosure, and in the court in which the proceedings took place. This court ought not to be asked, in a col- lateral proceeding, to question the validity of a decree which still remains unchallenged within the jurisdiction in which it was given. The plaintiff, if entitled to any relief against the proceedings at the time of the sale, should go into the court where that sale was conduct- ed, and challenge the regularity of the proceedings there. It seems to me that the whole difficulty with the complaint is that it is based upon what seems to me a not well-founded view of the relation of the parties herein. One bondholder is not a trustee for another, as a result simply of a common interest in the mortgaged property. The plaintiff had the same right that the defendants had to institute pro- ceedings looking towards a consolidation of the interests and bring- ing together all bondholders. In this case this agreement provided that it should not be effective until a majority of the bondholders had signed it, and also provided (which was, perhaps, surplusage) that any bondholder not signing it should have no rights under it, and also prescribed the time within which signatures should be . received. Now, these provisions, of course, were necessary, and the plaintiff is not in a position to challenge their validity, because it is provided, and the complaint alleges that by the sixth clause of the mortgage it was provided, "that upon any sale of the said premises, whether by the trustees or other judicial process, the holders of the bonds thereby secured, or any of them, or the said trustees on behalf of all the bondholders, should have the right to purchase upon equal terms with other persons"; so that by the very terms of the mortgage itself it was contemplated that a single bondholder, or any number of bond-

holders, might buy in order to protect themselves. And this the plaintiff knew when he took his bond, and has no ground for complaint if the other bondholders have seen fit to exercise that right. Any number of bondholders might have combined without permitting others to join them, but in this instance the agreement, upon the face of it, was open to all. Certainly the court ought not to say, where an agreement has been made, which the plaintiff might have taken advantage of, but has not, whether because he did not know of it, or whether he thought it was for his best interests not to do so, or for any other reason, that, simply because it turns out that his best interests would have been conserved by joining in the agreement, it will see that his error of judgment is corrected or his laches excused, and that he should be placed in as good a position as he would have had had he exercised the rights which he had. The other bondholders owed no active duty to him. They owed the same duty of fair dealing and right conduct that any person engaged in business ventures exercises. But they did not owe the active duty of seeing that he was informed of his rights, or of seeing that his position was fully explained to him, or of informing him of all the proceedings which they were taking to protect their individual interests.

I am referred to cases where it has been held that trustees could not purchase, etc., and it is not necessary that authority should be multiplied to sustain the principle. Had the trustees under the mortgage purchased this property, the plaintiff would probably have been entitled to consideration in a court of equity. But that is not the condition here. I am cited the case of Farmers' Loan & Trust Co. v. New York & N. R. Co., but it seems to me that this case cannot have any application here. That was the case of trustees of a railroad corporation acquiring the franchises and property of a rival, and permitting default for the purpose of destroying the property and compelling its sale. But it seems to me that the simple statement of the case indicates the wide difference existing between it and the one under consideration. And so, in another case that was cited, where trustees under a mortgage had been guilty of fraudulent complicity, and, instead of acting for the benefit of all bondholders, had acted for a few, it was held that their action was fraudulent. Of this there can be no doubt, because a trustee has the active duty of protecting each and all of the beneficiaries of the trust, and he cannot favor one at the expense of another. But that is not the case under consideration. We have the case of creditors, each occupying the same relative position towards the other, each owing no active duty towards the other, and each bound to the utmost to exercise vigilance to protect his own interests. If one sees fit to exercise diligence, and join with others for the benefit of such as may come in and contribute to the expense, he is not to be held accountable to one who has not seen fit to come in, whether his failure to join is due to his lack of knowledge or upon a careful consideration. Had the venture turned out unprofitably (and there is nothing here to show that it has not, except that there are still several millions of bonds and stock in existence; whether they are of any greater value than those for which they were exchanged does not appear),—

had it resulted in a loss,—there certainly is no principle of law or equity which would charge the plaintiff with his share of the expense or loss connected therewith. I am unable to see that the defendants have violated any duty which they owed to the plaintiff, or that they have been guilty of any wrong towards him.

Another consideration: This sale took place, and all of the circumstances must have been known to the plaintiff, as early as April, 1894; and from that time down until 1898 no move was made by him, although he says he knew of the existence of the bondholders' agreement at the time of the sale. It would seem that a plaintiff who has waited so long in a matter where great injury might result to innocent persons by reason of the rights acquired in the meantime, and who has slept for so long a time upon his rights, ought not to receive the consideration of a court of equity. His laches ought to defeat him. While it is true the plaintiff alleges that he is willing to contribute his share of the expense, I am not quite convinced that a man actively engaged in the business of handling stocks, and entirely familiar, as the plaintiff must be, with transactions of this kind, is entirely free from the imputation that his action is based upon the happening of more recent events than those set forth with so much particularity in the complaint. The demurrer is sustained, with costs.

Demurrer sustained, with costs.